UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

LICK BRANCH UNIT, LLC and           )
FOREXCO, INC.,                      )
                                    )
        Plaintiff,                  )
                                    )   Case No. 3:13-cv-203
        v.                          )
                                    )   Judge Curtis L. Collier
JIM REED, CHARLES BRUCE REED, and   )
JAMES LUEKING,                      )
                                    )
        Defendant.                  )

## M E M O R A N D U M

Before the Court are two motions to dismiss filed by Defendants Jim Reed, Charles Bruce

Reed, and James Lueking (collectively, "Defendants") (Court File Nos. 26, 28). Defendants argue

the amended complaint filed by Plaintiffs Lick Branch Unit, LLC ("LBU") and Forexco, Inc.

("Forexco") (collectively, "Plaintiffs") fails to state a claim under the Racketeer Influenced and

Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961 *et seq*. Because Plaintiffs have failed to

sufficiently allege diversity jurisdiction, Defendants urge the Court to decline to exercise

supplemental jurisdiction over the remaining state claims. Defendants also filed a motion to dismiss

these state law claims on the merits. Plaintiffs responded in opposition to both motions (Court File

Nos. 31, 32), to which Defendants replied (Court file Nos. 35, 36).

For the following reasons, the Court will **GRANT IN PART** and **DENY IN PART**

Defendants' motions (Court File Nos. 26, 28). Specifically, the Court will **DENY** Defendants'

motion to dismiss for lack of subject matter jurisdiction (Court File No. 28). The Court will also

**DENY** Defendants' motion to dismiss Plaintiffs' civil RICO with respect to Jim Reed and James

Lueking, tortious interference with a contract, conversion, nuisance, civil conspiracy, and slander

of title claims (Court File No. 26). The Court will **GRANT** Defendants' motion to dismiss

Plaintiffs' civil RICO claim with respect to Charles Bruce Reed, tortious interference with business

relations, abuse of process, interference with the Unit, and attorneys' fees claims (Court File No.

26).

## I.     FACTUAL BACKGROUND AND PROCEDURAL HISTORY

This case comes to the Court after what appears to be a long slog through the legal system

for all parties involved. At the center of the controversy is the Lick Branch Unit ("the Unit") oil

field in Scott County, Tennessee. The amended complaint alleges the Unit is an oil and gas field

created by Order of the Tennessee Oil and Gas Board in 1977 and governed by a Unit Agreement

also approved by the Board (Court File No. 1-1, Unit Agreement). The Unit Agreement creates two

types of interest: a "working interest" and a "royalty interest." Owners of both types of interest

received proceeds from the Unit but working interest owners are required to manage the oil and gas

operations as well as bear the costs they incur in doing so. When the Unit was created, the royalty

interests were held by land owners who owned the real property comprising the Unit. The working

interests were held by oil exploration companies holding rights under leases predating the creating

of the Unit.

Plaintiffs claim that LBU owns all of the working interests in the Unit and is the sole

working interest owner. It claims it acquired its interest in two separate transactions: a 1998 merger

with Cambridge Resources, Inc. and a 2011 purchase from PDC Resources, Inc. After acquiring all

the rights in 2011, Plaintiffs claim that LBU appointed Forexco as the Unit Operator by agreement,

and the Board approved the appointment by March 2012. Defendants, on the other hand, are three

of the nineteen royalty interest owners under the Unit Agreement. Jim Reed and James Lueking

jointly own one tract in the Unit that they acquired in 2004. Plaintiffs also allege that Jim Reed owns smaller tracts within the Unit as does Charles Bruce Reed. Defendants' predecessors executed pre-unit leases which were committed to the Unit in exchange for royalty interests.

According to the amended complaint, the Unit produced oil until 1994, at which point the operator implemented an enhanced strategy that involved injecting non-native natural gas in an effort to facilitate the extraction of more oil. This strategy is contemplated by the Unit Agreement and was approved of by the Board in 1996. Apparently as a result of this strategy, Defendants have been a significant impediment to operation of the Unit. Plaintiffs allege Defendants' efforts have included "direct physical and verbal altercations" with operators of the Unit, locking the gate used by operators of the unit, and filing a number of legal actions.

These legal actions began in 1997 when Jim Reed, on his own behalf and on behalf of his family members including Charles Bruce Reed, filed a lawsuit in Scott County Chancery Court against the operators and working interest owners at the time, which included PDC Resources and Cambridge Resources (Court File No. 1-3, 1997 Complaint). The 1997 complaint alleged the operators failed to develop the property and failed to pay royalties for gas stored on the Unit. The 1997 complaint additionally alleged the placement of a gas compressor on the Reeds' property had caused a nuisance, as well as other improper uses of their property. After filing an amended complaint, Jim Reed sought a termination of the lease and the Unit Agreement.

In 2000, Jim Reed sought injunctive relief to prevent the operators from placing a new compressor on his property. According to the amended complaint in this case, this occurred after Jim Reed had parked his vehicle at the compressor site and built a structure that prevented the operators from installing a new compressor. Additionally, Plaintiffs allege Jim Reed had a physical

altercation with the operators at the compressor site shortly before seeking injunctive relief. The court denied injunctive relief and provided that the operators may install new compressors at the site. The 1997 action was voluntarily dismissed in 2007 without a trial being held.

Some three days after voluntarily dismissing the 1997 action, Jim Reed filed another action, this time in Scott County Circuit Court (Court File No. 1-4, 2007 Complaint). He again acted on his own behalf and on behalf of his family including Charles Bruce Reed, but also added James Lueking as a plaintiff. The 2007 action listed the same defendants as the 1997 action, omitting LBU which by that time had acquired a portion of the working interests in the Unit. The allegations in the 2007 action were very similar to the 1997 action, and again accused the operators of misconduct in the placement of compressors on the 2007 plaintiffs' property as well as not reasonably developing the property. The 2007 plaintiffs sought money damages, a declaration that the lease and Unit Agreement were violated and that the lease was void (although, this time, not the Unit Agreement), as well as relief from the placement of the compressor.

Unlike the 1997 action, the 2007 action went to trial. The court bifurcated the action into two trials. In December 2008, the parties proceeded to trial to determine whether there was a six-month break in production of oil and gas during the "enhanced" strategy described above. The jury found that there was such a break and the court entered an order declaring the pre-Unit leases relevant to the 2007 plaintiffs terminated pursuant to Tenn. Code Ann. § 66-7-103 (Court File No. 1-5, 1/13/09 Order). Plaintiffs describe this as a "non-final interim" order.

The second trial was scheduled for November 2010 and was meant to determine whether Jim Reed and James Lueking could recover as a result of the termination of the relevant leases, to determine their damage claims with respect to the surface of their property, and to consider Jim

Reed's claim of a separate verbal lease. The court, however, dismissed the claim for trespass damages related to the compressor, dismissed the claim for nuisance damages also related to the compressor, and barred a claim for trespass damages following September 1, 1995. The second trial did consider Jim Reed's claim of a verbal lease and the jury found in his favor, awarding him damages for breach of the lease. The court entered judgment in November 2011 (Court File No. 1-6, 2007 Complaint–2011 Judgment). The 2007 plaintiffs were granted a total judgment of $436,043.04. The court dismissed without prejudice the 2007 plaintiffs' claim for one-eighth of gross rentals and for nuisance because the Board had exclusive jurisdiction over such a claim. The 2007 plaintiffs were also granted a non-suit on the issue of damages to the surface of their property with the right to refile. The judgment was appealed and affirmed, although the award was reduced to $36,000 plus interest (Court File No. 1-7, 2007 Complaint–2012 Judgment).

Litigation was not the only means Defendants used to interfere with the Unit's operation. In August 2011, LBU moved to designate Forexco as the operator of the Unit and filed an application with the Tennessee Oil and Gas Program. Jim Reed and James Lueking filed an objection to the application. Jim Reed sent a follow-up letter to Mike Burton, Supervisor of the Oil and Gas Program, in which he stated that the objectors to the application believed Forexco did not have the "rights necessary to assume the role of operator" (Court File No. 1-8, Burton Letter). It was the objectors' position that no current lease was outstanding on their property and that title or ownership of the property is disputed. He also accused Forexco of operating for several weeks without approval. He accused the individual he spoke with of being "either a blatant liar, attempting to perpetuate a fraud upon myself, my family and the State of Tennessee, and who appears to be willing to make any untrue statement that furthers his purpose, or a simple minded front man for

others, who has been placed on the ground without knowledge of the truth, to perpetrate their fraudulent intentions" (*id.* at p. 2). Important to Plaintiffs' claims, he purported to represent a 66% ownership interest in the property and claimed, if there was no outstanding lease on their property, to be a working interest owner to the extent of 7/8ths of their interest. The Office of General Counsel for the Department of Environment and Conservation later responded to Jim Reed's attorney, explaining the objection was overruled in part because the office did not consider the January 13, 2009 order to be a basis to submit the issue to the Oil and Gas Board or to administratively deny the operator change (Court File No. 1-9, Henry Letter). The letter suggested Jim Reed file a petition for a declaratory order.

In September 2011, *Plaintiffs* filed suit against Defendants in Scott County Circuit Court alleging ongoing interference with the operation of the Unit (Court File No. 1-10, 2011 Complaint). The complaint alleged various instances of misconduct on the part of Defendants, including tampering with the gate and harassing employees. Plaintiffs also alleged interference with business relationships and interference with contractual relationships on the basis of Defendants' alleged "misrepresentations" concerning the 2007 litigation, which apparently involved representing that they had "won" the litigation even though no final judgment was entered. The same judge who presided over the 2007 litigation ruled that LBU's predecessors were the operators of record and had the right to operate the Unit (Court File No. 1-13, 2011 Complaint–Injunction). The court also found Defendants do not have the right to shutdown the operation of the Unit without authorization of the Oil and Gas Board and do not have the right to keep operators off the property. The court then extended a temporary restraining order as an injunction and enjoined Defendants from locking the access gate or otherwise unlawfully interfering with the operation of the Unit (*id.*).

However, Plaintiffs claim Jim Reed and James Lueking continued to interfere with the operation of the Unit and caused delays in oil production. These actions included locking operators in or out and running over welding equipment. Additionally, Jim Reed and James Lueking sent a number of letters to entities and individuals associated with the operation of the Unit. In a December 2011 letter to Barrett Oil Purchasing, which purchases oil extracted from the Unit, Jim Reed and James Lueking claimed the leases on their property had been terminated and the proceeds were now payable to them, including LBU's working interest (Court File No. 1-14, Barrett Letter). In March 2013, Defendants' attorney sent a letter to the Michael Burton, as supervisor of the Tennessee Oil and Gas Program, repeating the theory they now had a 7/8th working interest, seeking guidance on how to proceed following the 2007 litigation, and requesting that Jim Reed and James Lueking be named as operators of the Unit (Court File No. 1-15, Burton Letter). Plaintiffs contend the letter misrepresents that LBU was divested of its working interest. The supervisor of the Oil and Gas Program granted Jim Reed and James Lueking's applications and named them operators of all wells within the Unit.

On March 15, 2013, workers arrived to a locked gate and Defendants who informed them they were now operators of the Unit. Five days later, Plaintiffs objected to the change of operator, and the Tennessee Department of Environment and Conservation ("TDEC") informed Defendants' attorney that it rescinded its approval of the change, concluding the interpretation of the 2007 litigation was for the Board (Court File No. 1-16, March 25, 2013 Letter). The letter also informed Defendants' attorney that the issue should be brought to the Board in a petition and that the status quo should remain in force at the Unit. According to the amended complaint, on June 18, 2013, the Board denied Jim Reed and James Lueking's applications to be named as operators, on the grounds

their claim of ownership was doubtful.

Plaintiffs also point to a number of other letters sent by Defendants, including a letter sent by James Lueking on March 18, 2013 noting the approval of his (not-yet-rescinded) appointment as operator and requesting certain information (Court File No. 1-17, March 18, 2013 Letter). Jim Reed and James Lueking also sent a letter to Forexco on March 19, 2013 "firing" it as operator (Court File No. 1-18, March 19, 2013 Letter). During this time period, Plaintiffs complain of other ways Defendants allegedly "deprived" them of the ability to operate the Unit such as shutting off the electricity, removing "red tags" placed on wells, transporting barrels of oil, and installing an electric fence. Finally, Plaintiffs point to an April 9, 2013 letter from Jim Reed and James Lueking to Forexco in which they claim to be owners of 66% working interest in the Unit, appointed themselves as representatives, and voted "by virtue of a majority interest" to remove Forexco as operator (Court File No. 1-19, April 9, 2013 Letter). On June 17, 2013, workers at the Unit discovered someone had shut off the valves to the oil wells that are accessed on the Reeds' property. Plaintiffs allege the well pump remained on, however, which increased the risk of an explosion.

In April 2013, Plaintiffs filed the instant action, alleging intentional interference with business relationships, tortious interference with contract, conversion, nuisance, abuse of process, a violation of RICO, slander of title, civil conspiracy, interference with the operation of the Unit, and an independent action for attorney's fees. In their original complaint, Plaintiffs only alleged jurisdiction pursuant to 28 U.S.C. § 1332 based on the diversity of the parties. Jim Reed and James Lueking then filed motions to dismiss for lack of jurisdiction (Court File Nos. 12, 18), arguing the

complaint failed to adequately allege facts supporting diversity jurisdiction.[1]  Plaintiffs amended

their complaint (Court File No. 20), alleging additional facts in support of diversity jurisdiction and

also asserting jurisdiction under 28 U.S.C. § 1331 based on the federal RICO claim.  Defendants

then filed the instant motions to dismiss.  The first motion seeks to dismiss this action based on

subject matter jurisdiction; the second motion seeks to dismiss the claims on the merits.

## II.     STANDARD OF REVIEW

A Rule 12(b)(6) motion should be granted when it appears "beyond doubt that the plaintiff

can prove no set of facts in support of his claim which would entitle him to relief." *Lewis v. ACB*

*Bus. Servs., Inc.*, 135 F.3d 389, 405 (6th Cir. 1998). For purposes of this determination, the Court

construes the amended complaint in the light most favorable to the plaintiff and assumes the veracity

of all well-pleaded factual allegations in the amended complaint. *Thurman v. Pfizer, Inc.*, 484 F.3d

855, 859 (6th Cir. 2007). The same deference does not extend to bare assertions of legal conclusions,

however, and the court is "not bound to accept as true a legal conclusion couched as a factual

allegation." *Papasan v. Allain*, 478 U.S. 265, 286 (1986).

The Court next considers whether the factual allegations, if true, would support a claim

entitling the plaintiff to relief. *Thurman*, 484 F.3d at 859. Although a complaint need only contain

a "short and plain statement of the claim showing that the pleader is entitled to relief," *Ashcroft v.*

*Iqbal*, 556 U.S. 662, 677-78 (2009) (quoting Fed. R. Civ. P. 8(a)(2)), this statement must

nevertheless contain "factual content that allows the court to draw the reasonable inference that the

defendant is liable for the misconduct alleged," *id.* "[T]o survive a motion to  dismiss, a complaint

---

[1] In light of the subsequently filed amended complaint and Defendants' newly filed motions, the Court will **DENY AS MOOT** these motions (Court File No. 12, 18).

must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Id.* (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Plausibility as explained by the Court "is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 556). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show [n]'—'that the pleader is entitled to relief.'" *Id.* at 679 (quoting Fed. R. Civ. P. 8(a)(2)).

## III. DISCUSSION

### A. Subject Matter Jurisdiction

Defendants move to dismiss this action for lack of subject matter jurisdiction. However, Plaintiffs bring a civil RICO claim over which the Court has federal question jurisdiction pursuant to 28 U.S.C. § 1331. The substance of Defendants' motion is that the Court should dismiss the civil RICO claim under Fed. R. Civ. P 12(b)(6) and decline to exercise supplemental jurisdiction over Plaintiffs' state law claims under 28 U.S.C. § 1367(c). *See Musson Theatrical, Inc. v. Fed. Exp. Corp.*, 89 F.3d 1244, 1255 (6th Cir. 1996) (discussing the difference between dismissing federal claims under Rule 12(b)(1) for lack of substance sufficient to confer subject matter jurisdiction and under Rule 12(b)(6) for failure to state a claim). Because the Court will not dismiss Plaintiffs' civil RICO claim, the Court will **DENY** Defendants' motion to dismiss for lack of subject matter jurisdiction.

### B. RICO

Much of the dispute between the parties centers around the adequacy of Plaintiffs' civil RICO claim. Defendants argue Plaintiffs' RICO claim fails for a number of reasons: it fails to plead

10

fraud with particularity, the six letters comprising the predicate acts do not constitute mail fraud, there is no allegation of direction, the allegations do not establish a "pattern" of racketeering activity, and the allegations fail to allege an "enterprise." Plaintiffs disagree, responding in kind to each point.

Section 1962(c) makes it unlawful for any person, associated with an enterprise, to conduct or participate in the conduct of that enterprise's affairs through a pattern of racketeering activity. 18 U.S.C. § 1962(c).[2] To state a claim under § 1962(c), a plaintiff must plead four elements: "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Moon v. Harrison Piping Supply*, 465 F.3d 719, 723 (6th Cir. 2006). "Racketeering activity" is defined as acts that constitute a violation of various state and federal criminal laws, including mail fraud, wire fraud, and extortion. 18 U.S.C. § 1961(1). A "pattern of racketeering activity" is defined as "at least two acts of racketeering activity" within a ten-year period. 18 U.S.C. § 1961(5). Merely pleading two predicate acts is insufficient, however, because "the term pattern itself requires the showing of a relationship between the predicates" and of the "threat of continuing activity." *H.J., Inc. v. Northwestern Bell Tele. Co.*, 492 U.S. 229, 239 (1989) (alteration, internal quotation marks, and citation omitted). "It is this fact of *continuity plus relationship* which combines to produce a pattern." *Id.*

### 1. Predicate Acts

Defendants argue Plaintiffs have failed to allege any predicate acts supporting a RICO claim.

---

[2] Plaintiffs did not specifically indicate which subsection of § 1962 they allege Defendants violated. Defendants reasoned that § 1692(c) was the only applicable subsection and Plaintiffs did not dispute that representation in response to Defendants' motion. In light of Plaintiffs' failure to respond to this point, the Court concludes that Plaintiffs proceed under § 1692(c) and will not analyze subsections (a) or (b).

Plaintiffs allege six letters constitute predicate acts of mail fraud: (1) a September 2011 letter from Jim Reed to Mike Burton of the Tennessee Oil and Gas Board; (2) a December 2011 letter from Jim Reed and James Lueking to Barrett Oil; (3) a March 2013 letter from Jim Reed's attorney, Johnny Dunaway, to TDEC; (4) a March 2013 letter from James Lueking to Barrett Oil; (5) a March 2013 letter from Jim Reed and James Lueking to Forexco; and (6) an April 2013 letter from Jim Reed and James Lueking to Forexco. The parties dispute whether any or all of these letters satisfy the pleading standards for mail fraud and for a civil RICO claim.

"Mail fraud consists of '(1) a scheme to defraud, and (2) use of the mails in furtherance of the scheme.'" *Heinrich v. Waiting Angels Adoption Servs., Inc.*, 668 F.3d 393, 405 (6th Cir. 2012) (quoting *United States v. Jamieson*, 427 F.3d 394, 402 (6th Cir. 2005)). "A scheme to defraud includes any plan or course of action by which someone uses false, deceptive, or fraudulent pretenses, representations, or promises to deprive someone else of money[ or property]."[3] *Id.* (quoting *Jamieson*, 427 F.3d at 402). Scienter is also a required showing; the plaintiff must demonstrate that the defendant acted with the specific intent to defraud or with recklessness with respect to potentially misleading information. *Id.*

Additionally, Fed. R. Civ. P. 9(b) imposes a heightened pleading standard that requires a plaintiff plead (1) the statements the plaintiff contends are fraudulent; (2) the identity of the speaker; (3) where and when the statements were made, and (4) why the statements were fraudulent. Not only does this require specifying the false statement, the plaintiff must also identify the basis for

---

[3] The Court notes a scheme to defraud need not necessarily involve a false statement, pretense, promise, or representation. *See United States v. Dobson*, No. 1:12–CR–42, 2013 WL 4049595, at *6, *13 (E.D. Tenn. Aug. 8, 2013) (discussing the necessary requirements of a scheme to defraud). In this case, however, Plaintiffs rely only on false statements contained in the six letters discussed above.

inferring scienter. "The courts have uniformly held inadequate a complaint's general averment of the defendant's 'knowledge' of material falsity, unless the complaint also sets forth specific facts that make it reasonable to believe that defendant knew that a statement was materially false or misleading.'" *Heinrich*, 668 F.3d at 406 (quoting *Greenstone v. Cambex Corp.*, 975 F.2d 22, 25 (1st Cir. 1992)).

Plaintiffs allege the purpose of the RICO enterprise in this case was "to interfere with operations at the Unit by, among other things, misrepresenting that Defendants own Working Interests in the Unit, which they do not own, in order to be named the operators of the Unit and exercise control over the Unit" (Court File No. 20, Amended Complaint, ¶ 102). Plaintiffs also allege Defendants "committed mail fraud by writing and mailing letters to TDEC, Barrett Oil Purchasing, Inc., and Forexco, Inc. misrepresenting that they controlled a sufficient portion of the Working Interests in the Unit to name themselves the operators for the Unit" (*id.* at ¶ 107). Plaintiffs argue the letters were sent "to execute a scheme to mislead and defraud TDEC, Barrett Oil Purchasing, Inc., Plaintiffs, and other third parties involved with the Unit or with interests in the Unit" (*id.* at ¶ 108).

As is indicated from these portions of Plaintiffs' amended complaint, the alleged misrepresentation in this case relates to statements by Defendants that they owned a working interest in the Unit. Defendants focus on other aspects of each letter that they argue render the letters either nonfraudulent or insufficient to serve as a predicate act. In light of this, the Court will assume for the purposes of this motion that Defendants were not in fact working interest owners as a result of the 2007 litigation and that such a statement would be false or misleading. Because the letters

attached to the amended complaint[4] are the only statements alleged by Plaintiffs–and the only predicate acts relied upon–Plaintiffs must identify at least two letters containing fraudulent statements to establish two predicate acts.[5]

In December 2011, after Defendants were enjoined from interfering with the operation of the Unit, Jim Reed and James Lueking sent a letter to Barrett Oil Purchasing, Inc., which purchases oil extracted from the Unit. Plaintiffs allege "Jim Reed and James Lueking misrepresented to Barrett Oil Purchasing that they owned 66% of the Working Interests in the Unit, and instructed Barrett Oil Purchasing to direct its payments accordingly" (Court File No. 20, Amended Complaint, ¶ 48). Assuming Plaintiffs are correct that Defendants did not properly own a working interest in the Unit, the letter contains affirmative misstatements of Defendants' (and Plaintiffs') legal interest. The letter states that "proceeds attributable to the working interest owners and override interest owners on these properties should now be payable to us" (Court File No. 1-14, December 2011 Letter). Moreover, the letter lists each working interest and indicates that some portion of that interest is now payable to Jim Reed and James Lueking "as a working interest" (*id.*).[6]

---

[4] The letters are actually attached to the original complaint, but the amended complaint incorporates them by reference (Court File No. 20, Amended Complaint, p. 4 n.2).

[5] Although there is only one scheme to defraud alleged in this case, the Supreme Court has recognized that a RICO claim may rely on only one scheme in the context of a plaintiff's pattern-of-racketeering-activity showing. *H.J.*, 492 U.S. at 240. The Sixth Circuit had previously indicated a single scheme with multiple mailings may not support a RICO claim in some circumstances, *Blue Cross & Blue Shield of Mich. v. Kamin*, 876 F.2d 543, 545 (6th Cir. 1989), but subsequent panels have indicated that multiple mailings associated with one scheme may serve as independent predicate acts, *Moon*, 465 F.3d at 723-24. However, the existence of only one scheme is relevant in the continuity analysis.

[6] Defendants argue that Plaintiffs fail to allege Barrett Oil complied with the request in the December 2011 letter or that Plaintiffs ever suffered injury as a result of this statement. Reliance is only relevant to the extent Plaintiffs must demonstrate proximate cause. *In re ClassicStar Mare Lease Litig.*, 727 F.3d 473, 487 (6th Cir. 2013) ("Plaintiffs need only show that the defendants'

14

On March 19, 2013, Jim Reed and James Lueking sent a letter to Forexco. This letter purported to terminate Forexco as an operator of the Unit. Defendants relied upon TDEC's order granting their appointment as operator and stated, "[a]s owners of 66.2298% of the Working Interest of the Lick Branch Unit, which constitute a majority of the Working Interest, and having appointed ourselves as representatives of our interest in the Operating Committee for the Unit; and by virtue of a majority interest in the Unit, we have voted, as allowed by the Lick Branch Unit Agreement and the Lick Branch Working Agreement, to remove you as operator" (Court File No. 1-18). On April 9, 2013, Jim Reed and James Lueking sent another letter to Forexco (Court File No. 1-19). This letter contains very similar statements to the March 19, 2013 letter. Because the Court assumes for the purposes of the motion that Defendants had no such interest at the time, Plaintiffs have successfully pleaded that these letters also contain fraudulent statements.

Plaintiffs must further allege facts that make it "reasonable to believe that defendant knew that a statement was materially false or misleading." *Heinrich*, 668 F.3d at 406. Here, Plaintiffs refer to two hearings in October and November 2011 that indicated the Unit Agreement was still operative (Court File No. 1-11, October 2011 Hrg Tr., p. 55-56) and that the determination of whose interest survived the 2007 litigation was the "province of the Oil and Gas Board" (Court File No. 1-12, November 2011 Hrg Tr., p. 7). Defendants' counsel reiterated their position that they have the right to control the working interest in light of the outcome of the 2007 litigation, but conceded that issue must be determined by the Oil and Gas Board, which would hold a hearing on the issue (Court File No. 1-11, p. 7). In February 2012, the Court issued its order stemming from the

---

wrongful conduct was 'a substantial and foreseeable cause' of the injury and the relationship between the wrongful conduct and the injury is 'logical and not speculative.'") (quoting *Trollinger v. Tyson Foods, Inc*., 370 F.3d 602, 615 (6th Cir. 2004)). This issue is discussed below.

November 2011 hearing, stating Defendants did not have the right to shut down operation of the Unit or "keep out the owners of the working interest in the Unit property from the Unit property" (Court File No. 1-13, 2012 Injunction). The court enjoined Defendants from further interference.

Construing these events in a light most favorable to Plaintiffs, it is reasonable to infer Defendants were aware they were not owners of the working interest in the Unit and the question of ownership of those interests would be determined by the Oil and Gas Board at a later time. The Court therefore concludes Plaintiffs adequately pleaded both that Jim Reed and James Lueking made false statements or misrepresentations in these letters and it is reasonable to believe they knew these statements were materially false or misleading.

Plaintiffs have pleaded a RICO violation predicated on multiple acts of mail fraud. In light of the allegedly fraudulent statements contained in these letters, the amended complaint establishes Defendants engaged in a "plan or course of action by which someone uses false, deceptive, or fraudulent pretenses, representations, or promises to deprive someone else of money[ or property]." *Heinrich*, 668 F.3d at 404. This scheme sought to obtain Plaintiffs' working interest in the Unit and to obtain payments accruing therefrom. The misrepresentation in these letters, assumed to be false for the purposes of this motion, was that Defendants had a working interest in the property (and Plaintiffs did not) when they knew or likely knew they had no such interest. Through a series of letters containing these materially false representations, Defendants attempted on multiple occasions to obtain Plaintiffs' working interest in the Unit as well as profits derived from Plaintiffs' business activities on the Unit. Plaintiffs have identified multiple false statements aimed at depriving Plaintiffs of property and the use of the mails in furtherance of Defendants' scheme.

Accordingly, Plaintiffs have adequately pleaded multiple mailings in furtherance of a scheme

16

to defraud and have satisfied the predicate act requirement of a civil RICO claim. In light of this conclusion, the Court need not consider whether the other letters contain fraudulent statements or were sent in furtherance of the scheme.

### 2. Causation

The Court must now assess whether Plaintiffs have pleaded the alleged scheme proximately caused Plaintiffs' injury. Although a plaintiff need not demonstrate he relied on the allegedly fraudulent statement, he "must show not only that the predicate act was a 'but for' cause of plaintiff's injuries, but also that it was a proximate cause." *Heinrich*, 668 F.3d at 405 ("To allege a valid RICO claim, however, a plaintiff must show not only that the predicate act was a 'but for' cause of plaintiff's injuries, but also that it was a proximate cause."); *id.* (rejecting an additional alleged predicate act because it did not proximately cause the plaintiff's injury). This requires "some direct relation" between the plaintiff's injury and the defendant's conduct. However, proximate cause is a "flexible concept" that must be assessed case-by-case. *Wallace v. Midwest Financial & Mortg. Servs., Inc.*, 714 F.3d 414, 419 (6th Cir. 2013). "For RICO purposes, reliance and proximate cause remain distinct—if frequently overlapping—concepts." *Id.* at 420. However, in a mail fraud case, "[a] plaintiff need only show use of the mail in furtherance of a scheme to defraud and an injury proximately caused by that scheme." *Id.* Thus each letter alleged as a predicate act need not have proximately caused Plaintiffs' injury: the *scheme* furthered by the letters must have. *Id.* ("[T]he appropriate inquiry in this case is not whether Wallace actually relied on the allegedly inflated appraisal, but whether the fraudulent scheme furthered by that appraisal proximately caused his financial injuries.").

Plaintiffs allege that at least some of their harm resulted from Defendants actions that

prevented Plaintiffs from fully operating the Unit in March and April 2013 (Court File No. 20, Amended Complaint, ¶¶ 56, 57). This resulted at least in part from the March and April 2013 letters to Forexco that the Court concludes contained potentially fraudulent statements. Moreover, these letters were sent in furtherance of a scheme to defraud, which allegedly succeeded at least temporarily in depriving Plaintiffs of their right to operate the Unit. Given that all reasonable inferences must be construed in Plaintiffs' favor, the Court concludes they have pleaded the alleged scheme proximately caused their injury.

### 3. Conduct

Defendants fault Plaintiffs for not alleging that any one of the Defendants *directed* the activity. To establish RICO liability, participation in an enterprise is not enough: the defendant must have participated in the "operation or management" of the enterprise. *Ouwinga v. Benistar 419 Plan Servs.*, 694 F.3d 783, 792 (6th Cir. 2012). "RICO liability is not limited to those with primary responsibility for the enterprise's affairs; only 'some part' in directing the enterprise's affairs is required." *Id.* (citing *Reves v. Ernst & Young*, 507 U.S. 170, 179 (1993)). "[D]efendants must have 'conducted or participated in the conduct of the '*enterprise's* affairs,' not just their *own* affairs." *Id.* (quoting *Reves*, 507 U.S. at 185) (emphasis in original). However, this showing "can be accomplished either by making decisions on behalf of the enterprise *or by knowingly carrying them out*." *Id.* (quoting *United States v. Fowler*, 535 F.3d 408, 418 (6th Cir. 2008)) (emphasis in original).

It is this "knowingly carrying them out" principle on which Plaintiffs rest their case. After all, they allege that each Defendant, at some point, "carried out" the decisions made on behalf of the enterprise. The Court agrees with respect to Jim Reed and James Lueking. The Supreme Court has clarified that an association-in-fact enterprise may be "form[ed] solely for the purpose of carrying

18

out a pattern of racketeering acts" and that "a pattern of racketeering activity may be sufficient in a particular case to permit a jury to infer the existence of an association-in-fact [enterprise]." *Boyle v. United States*, 556 U.S. 938, 942, 951 (2009). Thus looking to the letters on which Plaintiffs rely, both Jim Reed and James Lueking *literally* carried out the acts of the "enterprise." Moreover, Jim Reed and James Lueking stated on multiple occasions in the letters attached to the amended complaint they were representatives of a larger group. A reasonable inference from this statement is that, as purported representatives of a group, they made decisions on its behalf.

However, Plaintiffs have failed to establish RICO liability is appropriate for Charles Bruce Reed. The amended complaint contains allegations that Charles Bruce Reed engaged in some activity Plaintiffs take issue with: he allegedly ordered that some portion of oil on the property be moved when Plaintiffs were not in control of the Unit (Court File No. 20, Amended Complaint, ¶ 62). He also locked gates the Unit and ran over welding equipment (*id.* at ¶ 49). But none of these acts are related to the enterprise's alleged racketeering activity. Although there may be some facts alleged in the amended complaint that suggest Charles Bruce Reed was a land owner and interfered occasionally with operation of the Unit, there is simply no allegation that he had any involvement with the activity giving rise to Plaintiffs' RICO claim. Given this deficiency, the Court cannot conclude that Plaintiffs properly allege Charles Bruce Reed either directed the operation of the enterprise or carried out the decisions of the enterprise.

The Court concludes the amended complaint adequately alleges an association-in-fact enterprise operated by Jim Reed and James Lueking. However, because the amended complaint does not adequately allege Charles Bruce Reed participated in the operation or management of the enterprise or knowingly carried out the decisions of the enterprise, the RICO claims against him will

19

be **DISMISSED**.

### 4. Pattern of Racketeering Activity

Defendants also argue Plaintiffs have failed to demonstrate a pattern of racketeering activity. "[T]he pleading of two predicate acts may not be sufficient because § 1961(5) 'assumes that there is something to a RICO pattern *beyond* the number of predicate acts involved.'" *Moon*, 465 F.3d at 724 (quoting *H.J.*, 492 U.S. at 238). There are two kinds of continuity: closed-ended and open-ended. "A closed period of continuity may be demonstrated 'by proving a series of related predicates extending over a substantial period of time.'" *Id.* (quoting *H.J.*, 492 U.S. at 242). The Sixth Circuit has found seventeen months insufficient, *Vemco, Inc. v. Camardella*, 23 F.3d 129, 134 (6th Cir.1994), and suggested even two-and-one-half years would be insufficient in some circumstances, *Moon*, 465 F.3d at 725.

With respect to open-ended continuity, "[o]ften a RICO action will be brought before continuity can be established [by showing predicate acts spanning a substantial period of time]. In such cases, liability depends on whether the threat of continuity is demonstrated." *H.J. Inc*., 492 U.S. at 242. "[P]laintiffs must plausibly allege that there was a threat of continuing criminal activity beyond the period during which the predicate acts were performed." *Heinrich*, 668 F.3d at 410. Although this determination is fact specific, "[t]he threat of continuing racketeering activity need not be established . . . exclusively by reference to the predicate acts alone; rather, a court should consider the totality of the circumstances surrounding the commission of those acts." *Id.*

Defendants rely on *Moon v. Harrison Piping Supply*. In *Moon*, the plaintiff was an employee injured at work who initially received workers' compensation benefits. His complaint alleged that his employer, the compensation fund, a service company, and a doctor conspired to terminate his

20

benefits. He alleged these defendants comprised an "enterprise" under RICO that engaged in a pattern of racketeering activity, namely, mail fraud. He alleged five separate predicate acts–as here, each one a separate mailing–and the Sixth Circuit concluded, as had the district court, that these mailings satisfied the minimum two predicate acts requirement.

However, the court concluded the plaintiff failed to establish the continuity requirement. Because the predicate acts in *Moon* only lasted nine months, the alleged activity did not amount to a "substantial period of time." 465 F.3d at 725. Moreover, even if the court considered broader allegations extending the period to two-and-one-half years, the continuity requirement would still have been unsatisfied because "facts establishing a closed period of continuity are still lacking." *Id.* The plaintiff alleged the defendants "embarked upon a coordinated scheme to wrongfully terminate his workers' compensation benefits," and "[a]ll of the predicate acts . . . were keyed to Defendants' single objective of depriving Moon of his benefits." *Id.* The plaintiff alleged "[n]o other schemes, purposes, or injuries" and there were no alleged facts indicating defendants would continue beyond the goal of depriving the plaintiff of his benefits. *Id.* "In circumstances such as these, the purported racketeering activity does not bear the markings of the 'long-term criminal conduct' about which 'Congress was concerned' when it enacted RICO." *Id.* at 725-26 (quoting *H.J.*, 492 U.S. at 242).

Turning to the open-ended continuity showing, the court noted that the "inquiry turns on whether the plaintiff has pleaded facts suggesting the threat of continued racketeering activities projecting into the future." *Id.* at 726. A plaintiff must plead "facts showing 'a distinct threat of long-term racketeering activity,' or [] showing 'that the predicate acts or offenses are part of an ongoing entity's regular way of doing business.'" *Id.* at 727 (quoting *H.J.*, 492 U.S. at 242). In *Moon*, the plaintiff failed to establish open-ended continuity because a final decision by the workers'

compensation administrative body would be binding on the parties and would prevent the defendants from further withdrawing the plaintiff's benefits. Moreover, there were no allegations to suggest the fraudulent termination of workers' compensation was the defendants' regular way of doing business. Accordingly, the court affirmed the dismissal of the plaintiff's RICO claim.

Defendants argue a similar result is called for here. As in *Moon*, the alleged scheme is singular and focused on one goal: to obtain the working interest rights in the Unit. Defendants describe this as a simple property dispute that is not the type of long-term criminal activity targeted by RICO. Plaintiffs argue, however, that they have pleaded six predicate acts occurring over the course of some eighteen months. Moreover, the threat is ongoing in light of the last letter being sent within the month before the filing of this action as well as Plaintiffs' suspicion that Defendants tampered with valves at the Unit after the initiation of this lawsuit.

As the Court sees it, Plaintiffs have failed to demonstrate closed-ended continuity in this case. On Plaintiffs' theory, the predicate acts spanned a twenty-month period, which is on the border of a lengthy enough time period to establish closed-ended continuity. But even if it were not, there would be good reason to see the allegations in this case as failing to satisfy the closed-ended continuity requirement. As was the case in *Moon*, there is one dispute here: the control of the Unit. Plaintiffs attempt to bifurcate the alleged scheme in this case to establish two purposes: interference with the operation of the Unit and control of the Unit. But looking to the alleged fraud here–encompassed solely in six letters–Defendants have improperly and unlawfully sought to wrest control of the Unit from Defendants. In fact, the misrepresentations in these letters almost exclusively derive from a single, discrete legal dispute: whether the 2007 Judgment divested LBU (or its predecessors) of its working interest and whether Defendants now have a working interest of

22

their own. Defendants' conduct surrounding this fraud may involve some interference (such as locking the gates to the Unit) but the end goal of the alleged scheme is singular. Under *Moon*, closed-ended continuity is not established in this case.

However, the Court agrees with Plaintiffs that they have established open-ended continuity. Defendants in this case still own an interest in the land on which Plaintiffs operate, are still attempting to interfere with the operation of the Unit, and have plenty of opportunities to engage in this sort of racketeering activity in the future. As was the case in *Heinrich*, "the complaint does not allege an inherently terminable scheme—a pattern of racketeering activity with a built-in ending point." *Heinrich*, 668 F.3d at 410. And unlike *Moon*, where a final decision by an administrative body would preclude future fraud, there is reason to believe in this case that this activity will continue. Some of the fraudulent letters were sent after a court order enjoining Defendants from interfering with the operation of the Unit and clarifying that Defendants had no valid working interest. Given that this order did not prevent Defendants from misrepresenting their position, there is no reason to believe a decision by the Board would be any different. Moreover, "in the context of an open-ended period of racketeering activity, the threat of continuity must be viewed at the time the racketeering activity occurred," not in hindsight. *Id.* (quoting *United States v. Busacca*, 936 F.2d 232, 238 (6th Cir. 1991)). At the time the alleged racketeering activity occurred in this case, there was no end in sight to Defendants' misrepresentation of their interest in the Unit. In light of the ongoing relationship between the parties, Plaintiffs have adequately establish open-ended continuity.

### 5. Enterprise

Under RICO, an enterprise may be "any individual, partnership, corporation, association, or

23

other legal entity and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). To establish an enterprise under § 1962(c), a plaintiff must show "1) an ongoing organization with some sort of framework or superstructure for making and carrying out decisions; (2) that the members of the enterprise functioned as a continuing unit with established duties; and (3) that the enterprise was separate and distinct from the pattern of racketeering activity in which it engaged." *Ouwinga*, 694 F.3d at 793. Plaintiffs in this case allege Defendants comprised an "association-in-fact" enterprise. "[A]n association-in-fact enterprise must have at least three structural features: a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose." *Boyle*, 556 U.S. at 946.

Defendants argue Plaintiffs fail to explain "how and when" the enterprise was formed, what the relationship among Defendants is within the enterprise, and how to measure its longevity. Defendants also argue all actions taken by Defendants are "attributable" to their individual interest in the Unit and do not establish a distinction between the person and the enterprise. However, although an enterprise requires "a certain amount of organizational structure which eliminates simple conspiracies from the Act's reach," this organizational structure "need not be hierarchical, can make decisions on an ad hoc basis, and does not require the members to have fixed roles." *Ouwinga*, 694 F.3d at 794. A plaintiff need only demonstrate "a continuing unit that functions with a common purpose." *Boyle*, 556 U.S. at 948.

Plaintiffs have sufficiently pleaded such an enterprise. Defendants own an interest in some of the land comprising the Unit and have sought on multiple occasions over more than one decade to advocate for further control of that property. Jim Reed on multiple occasions claimed to speak

on behalf of himself, his family, and James Lueking as owners of a majority interest in the Unit. Jim Reed and James Lueking sent letters together claiming to represent the interests of a majority of the Unit. When they temporarily achieved their goal, they protected the Unit by locking out Forexco. They have indicated on multiple occasions that they operate as a group with an interest in the proper operation of the Unit. Perhaps no one could say it as well as Jim Reed and James Lueking themselves: "As owners of 66.2298% of the Working Interest of the Lick Branch Unit, which constitute a majority of the Working Interest, and having appointed ourselves as representatives of our interest in the Operating Committee for the Unit; and by virtue of a majority interest in the Unit, we have voted, as allowed by the Lick Branch Unit Agreement and the Lick Branch Working Agreement, to remove [Forexco] as operator" (Court File No. 1-18). That Defendants conceive of themselves as operating cohesively in an enterprise is evident from this language. This demonstrates a "continuing unit that functions with a common purpose." *Boyle*, 556 U.S. at 948.

Defendants argue the enterprise must also have a purpose beyond the alleged predicate acts, which is not pleaded here. However, the Supreme Court has stated that "a pattern of racketeering activity may be sufficient in a particular case to permit a jury to infer the existence of an association-in-fact [enterprise]." *Id.* at 951. In light of *Boyle*'s expansive view of association-in-fact enterprises, the Court concludes Plaintiffs have pleaded facts sufficient to demonstrate that Jim Reed and James Lueking comprise such an enterprise. Accordingly, the Court rejects Defendants' argument.

### 6. Conclusion

For the foregoing reasons, Defendants' motion will be **GRANTED IN PART** and **DENIED IN PART**. Plaintiffs' RICO claim against Charles Bruce Reed will be **DISMISSED** but their RICO

claim against Jim Reed and James Lueking will proceed.

## C. State Claims

Plaintiffs also bring state law claims of intentional interference with business relations, tortious interference with contract, conversion, nuisance, abuse of process, a violation of RICO, slander of title, civil conspiracy, interference with the operation of the Unit, and an independent action for attorney's fees that Defendants have moved to dismiss. The Court addresses each claim in turn.

### 1. Intentional Interference with Business Relations

Plaintiffs allege Defendants have intentionally interfered with Plaintiffs' business relationships with Barrett Oil, Plateau Electric Cooperative, other royalty owners of the Unit, TDEC, and the Board and the Tennessee Oil and Gas Program. To establish a claim for intentional interference with a business relationship, Plaintiffs must show "(1) an existing business relationship with specific third parties or a prospective relationship with an identifiable class of third persons; (2) the defendant's knowledge of that relationship and not a mere awareness of the plaintiff's business dealings with others in general; (3) the defendant's intent to cause the breach or termination of the business relationship; (4) the defendant's improper motive or improper means; and [] (5) damages resulting from the tortious interference." *Trau-Med of Amer., Inc. v. Allstate Ins. Co.*, 71 S.W.3d 691, 701 (Tenn. 2002) (internal citation omitted). Defendants note the Tennessee Supreme Court indicated this tort does not apply to relationships formalized in a contract. *Id.* at 701 n.4. Plaintiffs argue, on the other hand, that the tort is not limited to non-contractual relationships but merely includes such relationships.

The Court agrees with Defendants. The Tennessee Supreme Court adopted comment c of

26

Section 766B of the Restatement (Second) of Torts, which states that the tort applies to "relationship[s] not amounting to a formal contract." *Id.* As comment a clarifies, "[t]his Section is concerned only with intentional interference with prospective contractual relations, *not yet reduced to contract*. The rule for the actor's intentional interference with a third person's performance of his existing contract with the plaintiff is stated in § 766." Restatement (Second) of Torts § 766B cmt. a (emphasis added); *see also Thompson v. Hayes*, 748 F. Supp. 2d 824, 833 (E.D. Tenn. 2010) (quoting § 766B cmt. a and concluding "[t]he cases cited by plaintiffs in support of their argument that the tort may apply where the existing business relationship is contractual do not sufficiently demonstrate such is the case"). Moreover, the Sixth Circuit has explicitly recognized that this tort is limited to non-contractual relationships. *Crouch v. Pepperidge Farm, Inc.*, 424 F. App'x 456, 461 (6th Cir. 2011) ("[T]his tort protects non-contractual business relationships, so we will not apply it to the contractual relationship between Crouch and Pepperidge Farm.") (citing *Trau-Med*, 71 S.W.3d at 698-701, 701 n.4).

Because the amended complaint indicates the relationships listed in this claim were contractual, this claim must be dismissed (Court File No. 20, Amended Complaint, ¶ 14) (describing the royalty owners' interests pursuant to the Unit Agreement); (*id.* ¶ 48) ("Barrett Oil Purchasing buys the oil extracted through Unit operations and pays the Working Interest Owner and Royalty Owners for the oil it purchases in accordance with the terms of the Unit Agreement."); (*id.* ¶ 77) (alleging interference with "the contract between Forexco, Inc, and Plateau Electric Cooperative").

Defendants also argue the tort is inapplicable to Plaintiffs' relationships with TDEC, the Board, and the Oil and Gas Program because they are government entities and thus not engaged in a "business" relationship. The Court need not decide this question because Plaintiffs' relationship

27

with these entities is controlled by the Unit Agreement and thus outside the reach of the tort (*id.* ¶ 13) ("The Lick Branch Unit is a unitized oil and gas field created by Order of the Oil and Gas Board in 1977 and governed by a Board-approved Unit Agreement[.]"); (*id.* at p. 12 n.4) (describing both the Oil and Gas Program and TDEC as arms of the Board subject to its review).

### 2. Tortious Interference with a Contract

Plaintiffs allege Defendants violated Tenn. Code Ann. § 47-50-109 by intentionally interfering with contracts. Section 47-50-109 of the Tennessee Code, which codifies the common law procurement of breach of contract claim, requires a plaintiff prove the following elements: "1) there must be a legal contract; 2) the wrongdoer must have knowledge of the existence of the contract; 3) there must be an intention to induce its breach; 4) the wrongdoer must have acted maliciously; 5) there must be a breach of the contract; 6) the act complained of must be the proximate cause of the breach of the contract; and, 7) there must have been damages resulting from the breach of the contract." *Myers v. Pickering Firm, Inc.*, 959 S.W.2d 152, 158 (Tenn. Ct. App. 1997).

The parties dispute whether any contracts were actually breached. Plaintiffs allege Defendants' actions caused a breach between Forexco and LBU because Forexco was precluded from conducting oil and gas operations at the Unit by Defendants in contravention of the operation contract. Plaintiffs also allege Defendants caused Plateau Electric Cooperative to breach its contract with Forexco when Defendants caused Plateau to cease providing electricity to the Unit. Finally, Plaintiffs allege Defendants interfered with the Unit Agreement. Defendants argue the allegations surrounding the existence and breach of these contracts are too vague to withstand a motion to dismiss.

The Court does agree with Defendants that breach of the Unit Agreement may not serve as the basis of a tortious interference with a contract claim. "[A] party to a contract cannot be liable for tortious interference with that contract." *Aldridge v. City of Memphis*, 404 F. App'x 29, 43 (6th Cir. 2010) (quoting *Cambio Health Solutions, LLC v. Reardon*, 213 S.W.3d 785, 789 (Tenn. 2006)). Plaintiffs suggest, without providing authority, that this principle does not extend to multi-party contracts. However, the Tennessee Supreme Court made clear that "[t]his principle correctly reflects the purpose of the tort of intentional interference, which is to deter *third* parties from interfering with the contractual relations of parties to a contract." *Cambio*, 213 S.W.3d at 789 (emphasis in original). Accordingly, any breach of the Unit Agreement may not serve as the basis for this claim.

The primary question raised by Defendants' motion is whether the remaining contracts were in fact breached. Although Defendants' argument has some merit, at this stage the Court will not dismiss this claim. There may be provisions in the contracts that render nonperformance not to be a breach in circumstances such as this. However, in light of Plaintiffs' allegation that these entities were precluded from performing under these contracts and that these contracts were breached, this claim will proceed.

### 3. Conversion

Plaintiffs claim Defendants converted their oil wells and equipment over a nearly four-week period during which Plaintiffs were excluded from the Unit. They also claim Defendants removed approximately 210 barrels of oil from the Unit.

Defendants argue this claim must be dismissed based upon the "economic loss" rule. "[T]he economic loss doctrine[ is] a judicially created principle that reflects an attempt to maintain separation between contract law and tort law by barring recovery in tort for purely economic loss."

*Lincoln Gen. Ins. Co. v. Detroit Diesel Corp.*, 293 S.W.3d 487, 488 (Tenn. 2009). Defendants argue because there is privity of contract between the parties, the economic loss rule precludes Plaintiffs' conversion action. However, this doctrine typically applies in the products liability context. *See Ham v. Swift Transp. Co., Inc.*, 694 F. Supp. 2d 915, 922 (W.D. Tenn. 2010) ("Tennessee's highest court has never addressed whether the economic loss doctrine applies outside of the products liability context."). In addressing the contours of the doctrine outside of that context, many federal courts have concluded that the doctrine should not be extended beyond cases involving the sale of goods. *See, e.g., Tan v. Wilbur Smith Assocs., Inc.*, No. 2:09–cv–25, 2011 WL 3421320, at *6 (E.D. Tenn. Aug. 4, 2011) (declining to apply the doctrine outside of the sale of goods); *Ham*, 694 F. Supp. 2d at 922 ("[F]ederal courts applying Tennessee law have declined to extend the economic loss doctrine beyond cases involving the sale of goods."); *Pascarella v. Swift Transp. Co.*, 694 F. Supp. 2d 933, 945 (W.D. Tenn. 2010) ("The Tennessee Court of Appeals has since implicitly restricted the economic loss doctrine to claims involving products liability or the sale of goods, at least where the plaintiff can establish a sufficiently direct relationship between the defendant's negligent act and the plaintiff's economic loss."). *But see Ladd Landing, LLC v. Tenn. Valley Authority*, 874 F. Supp. 2d 727, 732-33 (E.D. Tenn. 2012) (disagreeing with *Ham* and extending th doctrine to the loss of business income related to the spill of coal ash).

Regardless, the economic loss doctrine generally precludes actions for *negligence*, not intentional torts. *See Lincoln Gen.*, 293 S.W.3d at 489 ("Tennessee has joined those jurisdictions which hold that product liability claims resulting in pure economic loss can be better resolved on theories other than negligence . . . ."); Vincent R. Johnson, The Boundary–Line Function of the Economic Loss Rule, 66 Wash. & Lee L. Rev. 523, 529 (2009) (noting the position that the doctrine

applies to intentional torts is "extreme" and that "[i]n cases where economic losses are deliberately and tortiously inflicted there is little reason to save the defendant from liability, whether under the economic loss rule or otherwise"); *see also PNC Multifamily Capital Institutional Fund XXVI Ltd P'ship v. Bluff City Cmty. Dev. Corp*, 387 S.W.3d 525, 553 (Tenn. Ct. App. 2012) ("Conversion is an intentional tort . . . ."). Defendants have identified no Tennessee case extending the doctrine to theories of conversion and at least one court has declined to do so. *Hansen v. Liberty Partners, LLC*, No. 3:04-1099, 2005 WL 3527162, at *11-12 (M.D. Tenn. Dec. 22, 2005) ("Other courts presented with the issue have not reached an accord, although many have concluded that intentional torts, including claims for conversion, are not barred by the economic loss rule."). In the absence of Tennessee case law suggesting the economic loss doctrine should extend to claims of conversion, the Court will deny Defendants' motion on this ground.

To the extent Defendants also argue the conversion claim is subsumed into the Unit Agreement such that Plaintiffs may not recover on a conversion theory, Tennessee courts recognize plaintiffs may plead separate breach of contract and conversion claims. *See Arvest Bank v. Byrd*, No. 10-2004, 2011 WL 6179792, at *4 (W.D. Tenn. Dec. 12, 2011) ("Although conversion claims are often 'factually intertwined' with contracts, breach of contract and conversion are separate claims that depend on separate analyses and issues."); *Bluff Springs Apartments, Ltd. v. Peoples Bank of South*, No. E2009-01435-COA-R3-CV, 2010 WL 2106210, at *10 (Tenn. Ct. App. May 26, 2010) ("There is little question that the Plaintiffs in the present case present both a breach of contract claim and a conversion claim."). The conversion theory in this case is based not on a breach of the Unit Agreement, but on Defendants' conduct allegedly resulting from a scheme to defraud. Accordingly, this claim will proceed.

### 4. Nuisance

Plaintiffs allege Defendants actions have "annoyed and disturbed" their ability to freely use the Unit and the Defendants' actions amount to a nuisance. Defendants again argue Plaintiffs should be cabined to contract damages. "However, a plaintiff may recover in tort and in contract so long as the damages for the two causes of action are distinct." *Farris v. Standard Fire Ins. Co.*, 280 F. App'x 486, 489 (6th Cir. 2008). Based on the allegations in the amended complaint, the nuisance claim may rely upon Defendants' conduct that is extra-contractual. The Court will not dismiss this claim on this ground.

Defendants argue Plaintiffs' claim must be dismissed because they do not own a property interest in the Unit. "A nuisance has been defined as anything which annoys or disturbs the free use of one's property, or which renders its ordinary use or physical occupation uncomfortable." *Clabo v. Great Am. Resorts, Inc.*, 121 S.W.3d 668, 671 (Tenn. Ct. App. 2003) (quoting *Pate v. City of Martin*, 614 S.W.2d 46, 47 (Tenn. 1981)). Contrary to Defendants' argument, the ownership of real property is not a necessary prerequisite to a nuisance claim; a plaintiff need only own a property interest. For instance, the Tennessee Court of Appeals has recognized that a leaseholder may bring a nuisance claim. *Frank v. Gov't of City of Morristown*, 294 S.W.3d 566, 571 (Tenn. Ct. App. 2008) (finding a city's actions did not constitute a nuisance but noting "it is clear that the noise, dirt, debris, and obstruction complained of annoyed or disturbed Ms. Frank's free use of her leasehold and rendered its ordinary use uncomfortable").

As Plaintiffs note, they own an easement in the Unit, which is itself a property right (Court File No. 1-1, Unit Agreement, ¶ 10.1) (granting an easement to working interest owners in use of the land in the Unit Area). *See Van Winkle v. City of Lavergne*, No. M2000-01784-COA-R3-CV,

2001 WL 1141349, at *5 (Tenn. Ct. App. Sept. 27, 2001) ("An easement is a real property interest that confers on its holder a right to use the property of another for a specific purpose."). Moreover, the Restatement (Second) of Torts explicitly lists owners of easements as potential plaintiffs in a private nuisance suit. Restatement (Second) of Torts § 821E ("For a private nuisance there is liability only to those who have property rights and privileges in respect to the use and enjoyment of the land affected, including . . . owners of easements . . . in the land . . . ."). The Court therefore rejects this argument.

Finally, Defendants accuse Plaintiffs of making only "conclusory allegations." To the contrary, Plaintiffs have alleged significant misconduct on Defendants' part interfering with Plaintiffs' use of their property interest.

The Court will deny Defendants' motion on this ground.

### 5. Abuse of Process

"To establish an abuse of process claim, a plaintiff must show '(1) the existence of an ulterior motive; and (2) an act in the use of process other than such as would be proper in the regular prosecution of the charge.'" *In re McKenzie*, 476 B.R. 515, 534-35 (E.D. Tenn. 2012) (quoting *Priest v. Union Agency*, 125 S.W.2d 142, 143 (1939)). "The improper purpose usually takes the form of coercion to obtain a collateral advantage, not properly involved in the proceeding itself, such as the surrender of property or the payment of money, by the use of the process as a threat or a club." *Bell* ex rel. *Snyder v. Icard, Merrill, Cullis, Timm, Furen & Ginsburg, P.A.,* 986 S.W.2d 550, 555 (Tenn. 1999) (internal quotations omitted). Abuse of process does not occur unless the "process is perverted, i.e., directed outside of its lawful course to the accomplishment of some object other than that for which it is provided." *Id.* (quoting *Priest*, 125 S.W.2d at 144).

33

Plaintiffs allege Defendants committed abuse of process when they misrepresented the January 2009 order to TDEC and Barrett Oil. "Process," however, is defined as "that which emanates from or rests upon court authority and which constitutes a direction or demand that the person to whom it is addressed perform or refrain from doing some prescribed act.'" *Matthews v. Storgion*, 174 F. App'x 980, 986 (6th Cir. 2006) (quoting *Bell v. Icard, Merrill, Cullis, Timm, Furen & Ginsburg, P.A*, No. 03A01–9707–CV–00292, 1998 WL 24414, at *2 (Tenn. Ct. App. Jan. 20, 1998)); *see also* 1 Am. Jur. 2d *Abuse of Process* § 2 ("It has also been stated that for purposes of abuse of process, 'process' refers to the papers issued by a court to bring a party or property within its jurisdiction, such as a writ of attachment, the process used to initiate a civil action, or the process related to the bringing of criminal charges."). The January 2009 order on which Plaintiffs rely did none of these things. It merely declared that pre-Unit leases were terminated; it did not constitute a direction or a demand to any person to perform any act. The Court has been unable to locate any authority suggesting that a misrepresentation of an order to a third party outside of the judicial process constitutes an abuse of process. *See Merritt-Chapman & Scott Corp. v. Elgin Coal, Inc.*, 358 F. Supp. 17, 21 (E.D. Tenn. 1972) (describing "process" as "use of a writ, order, or command of the Court *in the course of a judicial proceeding*") (emphasis added). Fraudulent it may well be, but an abuse of process it is not.

Accordingly, the Court will dismiss Plaintiffs' abuse of process claim.

### 6. Slander of Title

Plaintiffs also claim Defendants committed slander of title by publishing false statements about their ownership of the working interests in the Unit. Defendants argue this claim fails because Plaintiffs have no interest in the real property comprising the Unit. However, "[s]lander of title now

34

generally refers to the publication of false and malicious statements disparaging another's interest in real or personal property that the person making the statements should recognize as likely to result in pecuniary harm through the conduct of third persons with respect to the other's interest in the property." *Harmon v. Shell*, Nos. 1409, 01-A-01-9211CH00451, 1994 WL 148663, at *4 (Tenn. Ct. App. Apr. 27, 1994) (citing Restatement (Second) of Torts § 624 (1976)).   A plaintiff must demonstrate "(1) that it has an interest in the property, (2) that the defendant published false statements about the title to the property, (3) that the defendant was acting maliciously, and (4) that the false statements proximately caused the plaintiff a pecuniary loss." *Brooks v. Lambert*, 15 S.W.3d 482, 484 (Tenn. Ct. App. 1999) (quoting *Harmon*, 1994 WL 148663, at *4).

As indicated above, Plaintiffs' working interest includes easement rights in the Unit. And contrary to Defendants' argument, that Plaintiffs' amended complaint refers to Defendants' disparaging remarks regarding Plaintiffs' *working interest* does not preclude them from relying on the easement granted as a result of that working interest.   Defendants' misrepresentation that Plaintiffs lacked a working interest in the Unit also necessarily disparaged their interest in the easement granted to working interest owners.   Accordingly, the Court denies Defendants' motion on this ground.

### 7. Civil Conspiracy

Plaintiffs allege a civil conspiracy in which Defendants conspired to "maliciously and unlawfully" interfere with Plaintiffs' rights.   Defendants argue the only predicate act for the conspiracy claim is the tortious interference with a contract claim discussed above.   Because that claim fails, Defendants' reason, so too must this one.   Even were this the only predicate for the civil conspiracy claim, the Court denies Defendants' motion to dismiss it.   Accordingly, the Court denies

35

Defendants' motion to dismiss the civil conspiracy claim as well.

### 8. Interference with the Unit

Plaintiffs claim Defendants willfully, intentionally, and maliciously interfered with the operation of the Unit. Plaintiffs point to the following quotation from *Trau-Med*:

> Every one has the right to establish and conduct a lawful business, and is entitled to the protection of organized society, through its courts, whenever that right is unlawfully invaded. Such right existing, the commission of an actionable wrong is established against any one who is shown to have intentionally interfered with it, without justifiable cause or excuse.
> . . . .
> In short, if an act be hurtful to another, intentional, and without legal justification, it is malicious in the true legal sense, . . . therefore unlawful, and is actionable.

*Trau-Med*, 71 S.W.3d at 698 (quoting *Hutton v. Watters*, 179 S.W. 134, 135 (1915)). The court in *Trau-Med* relied on this quotation in discussing whether to adopt the tort of intentional interference with business relationships. The court did not create a catch-all business-related-misconduct tort. Plaintiffs apparently realize this, conceding Tennessee has not recognized this as a tort "in such terms" but urging that Defendants' conduct should not go "unremedied." Given that the Court is not dismissing a number of Plaintiffs' claims, the conduct will not go unremedied if Plaintiffs' meet their evidentiary burden. The Court will dismiss this claim.

### 9. Attorney's Fees

Finally, Defendants dispute the appropriateness of attorney's fees. "Tennessee recognizes two distinct exceptions to [the American Rule that each party bear its own attorneys' fees], however, and allows recovery of attorneys' fees under an implied indemnity agreement in appropriate cases and under an independent tort theory." *Engstrom v. Mayfield*, 195 F. App'x 444, 451 (6th Cir. 2006) (citing *Pullman Standard, Inc. v. Abex Corp.*, 693 S.W.2d 336, 338 (Tenn. 1985)). The Tennessee Supreme Court in *Pullman* explained the independent tort theory as follows:

36

> One who through the tort of another has been required to act in the protection of his interests by bringing or defending an action against a third person is entitled to recover reasonable compensation for loss of time, attorney fees and other expenditures thereby suffered or incurred in the earlier action.

*Pullman*, 693 S.W.2d at 340 (quoting Restatement (Second) of Torts § 914(2) (1979)) (internal quotation marks omitted). "It is clear that this provision envisions application of the independent tort exception both 'when the preceding action was brought against the present plaintiff either by a third person or by the state, and also when the present plaintiff has been led by the defendant's tort to take legal proceedings against a third person.'" *Engstrom*, 195 F. App'x at 451-52 (quoting Restatement (Second) of Torts § 914(2)).

Plaintiffs claim their fees incurred in the administrative action should be obtainable through this tort and they "may need" to take additional legal action against third parties. However, the administrative action did not involve litigation with third parties. Rather, the administrative action and this action involve the same parties. The *Pullman* exception does not allow any plaintiff who has suffered a tort to bring a separate claim for attorney's fees. Such a broad exception would surely swallow the rule. A plaintiff bringing an independent tort for attorney's fees must have been dragged into litigation with a *third party*. That has not been alleged here. Although Plaintiffs claim they may have to engage in litigation at some point with some third party, Plaintiffs may not proceed on this claim as a placeholder for future expenses. The Court will dismiss this claim.

## IV.    CONCLUSION

For the foregoing reasons, the Court will **GRANT IN PART** and **DENY IN PART** Defendants' motions (Court File Nos. 26, 28). Specifically, the Court will **DENY** Defendants' motion to dismiss for lack of subject matter jurisdiction (Court File No. 28). The Court will also **DENY** Defendants' motion to dismiss Plaintiffs' civil RICO with respect to Jim Reed and James

Lueking, tortious interference with a contract, conversion, nuisance, civil conspiracy, and slander of title claims (Court File No. 26).  The Court will **GRANT** Defendants' motion to dismiss Plaintiffs' civil RICO claim with respect to Charles Bruce Reed, tortious interference with business relations, abuse of process, interference with the Unit, and attorney's fees claims  (Court File No. 26).

**An Order shall enter.**

**/s/**_____
**CURTIS L. COLLIER**
**UNITED STATES DISTRICT JUDGE**