IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| | | |
|---|---|---|
| LICK BRANCH UNIT, LLC, AND FOREXCO, INC., | ) ) ) | |
| *Plaintiffs*, | ) ) | |
| v. | ) ) | |
| JIM REED, CHARLES BRUCE REED, AND JAMES LUEKING, | ) ) ) | |
| *Defendants*. | ) ) ) | No. 3:13-CV-203<br>Judge Curtis L. Collier<br>Magistrate Judge Christopher Steger |
| JAMES LUEKING, CHARLES BRUCE REED, AND JIM REED Individually, and as Attorney in Fact for Jean Reed, Freda Reed Davis, James Russell Reed, Deborah Reed Brandon, and Michael Allen Reed, | ) ) ) ) ) ) ) ) | |
| *Counterclaim-Plaintiffs*, | ) ) | |
| v. | ) ) | |
| LICK BRANCH UNIT, LLC, FOREXCO, INC, FOREXCO ENERGY, LLC, MICHAEL GAMBLIN, CAMBRIDGE RESOURCES, INC, PDC RESOURCES, INC, LICK BRANCH UNIT JOINT VENTURE, CITIPOWER, LLC, CITIENERGY, LLC, and DANIEL R. FORSBERG, | ) ) ) ) ) ) ) ) ) | |
| *Counterclaim-Defendants and Third-Party Defendants*. | ) ) ) | |

# **M E M O R A N D U M**

Before the Court are cross motions for partial summary judgment. Defendants/Counterclaim-Plaintiffs Jim Reed *et al.* ("Defendants") moved for partial summary

judgment pursuant to Federal Rule of Civil Procedure 56(a) seeking a determination that Plaintiffs/Counterclaim-Defendants Lick Branch Unit, LLC *et al.* ("Plaintiffs") do not own a working interest in the oil, gas, and minerals beneath Defendants' property. (Doc. 97.) Plaintiffs also moved for partial summary judgment seeking dismissal of the Counter-Complaint and Third-Party Complaint on the ground that Plaintiffs' ownership of a working interest in the oil, gas, and minerals beneath Defendants' property renders Defendants' claims untenable. (Doc. 101.) Both Plaintiffs and Defendants filed responses (Docs. 104 & 106, respectively) and replies (Docs. 107 & 108, respectively).

For the reasons explained below, the Court finds Defendants own the working interest in the oil, gas, and minerals beneath their property. The Court will therefore **GRANT** Defendants' motion for partial summary judgment (Doc. 97) and **DENY** Plaintiffs' motion for partial summary judgment (Doc. 101).

I. **BACKGROUND**

Defendants and their predecessors in interest leased the working interest in their land to Plaintiffs and Plaintiffs' predecessors in interest in the 1960s. Defendants argue that under Tennessee law the working interest in their land reverted back to them due to a six-month stop in production occurring in 1994 and 1995.

A. **The Underlying Leases**

Defendants own land above a geological formation containing oil, gas, and other minerals. (Doc. 97.) In 1965 and 1967, Defendants and their predecessors in interest leased the mineral rights to their property to Plaintiffs' predecessors in interest in two separate leases (the "Underlying Leases"). (*Id.*) These leases granted Plaintiffs' predecessors in interest a "working

interest" in Defendants' property. (*Id*.) The owner of a working interest under an oil and gas lease has the exclusive right to develop and produce oil and gas from the property, but must pay all costs of doing so, and normally must also pay royalties to the lessor. (*Id*. (citing Howard R. Williams & Charles J. Meyers, *Manual of Oil and Gas Terms*, (13th ed. 2006); *Black's Law Dictionary*, (10th ed. 2014)).) This was true of the Underlying Leases in this case.

In Tennessee, all oil and gas leases, including those at issue here, are governed by Tennessee Code Annotated § 66-7-103. *See Tengasco, Inc. v. Eastern Am. Energy Corp*., No. 03A01–9703–CV–81, 1997 WL 476797, at *5 (Tenn. Ct. App. Aug. 1, 1997) ("In effect, the provisions of [] § 66-7-103 are written into every oil and gas lease."). According to § 66-7-103(a)(1):

> Any lease or oil or natural gas rights or any other conveyance of any kind separating such rights from the freehold estate of land shall expire at the end of ten (10) years from the date executed unless, at the end of such ten (10) years, natural gas or oil is being produced from such land for commercial purposes. ***If, at any time after the ten-year period, commercial production of oil or natural gas is terminated for a period of six (6) months, all such rights shall revert to the owner of the estate out of which the leasehold estate was carved.*** No assignment or agreement to waive the provisions of this subsection (a) shall be valid or enforceable.

(emphasis added.)

### B. The Unit Agreement

Several different landowners control the land above the oil and gas reservoir at issue here. (Doc. 97.) In order to more efficiently explore and exploit the oil and gas beneath their land, Defendants, Defendants' predecessors in interest, and Plaintiffs' predecessors in interest executed a unit agreement in 1976 (the "Unit Agreement"). (*Id*.) The Unit Agreement created the "Lick Branch Unit," an agreement between the various landowners and the owners of the working interests to facilitate efficient and productive extraction of the oil and gas from the

single reservoir beneath the various landowners' properties. (*Id.*) Unitization of this kind was expressly permitted by Tennessee law and the Underlying Leases, and this particular unitization agreement was approved by the Tennessee Oil and Gas Board in 1977. (*Id.*)

The language of the Unit Agreement did not extinguish the Underlying Leases, create any new property rights, or vary the terms of the Underlying Leases with regard to Defendants' rights as relevant to § 66-7-103(a)(1). (*See* Doc. 1-1.) Three passages from the Unit Agreement are particularly instructive:

> 3.3 AMENDMENT OF LEASES AND OTHER AGREEMENTS
>
> The provisions of the various leases, agreements, division and transfer orders, or other instruments covering the respective tracts or the production therefrom are amended to the extent necessary to make them conform to the provisions of this agreement, but otherwise shall remain in effect.
>
> 3.5 TITLES UNAFFECTED BY UNITIZATION
>
> Nothing herein shall be construed to result in the transfer of title to the oil and gas rights by any party hereto to any other party or to [the] Unit Operator. The intention is to provide for the cooperative development and operation of the tracts and for the sharing of unitized substances as herein provided.
>
> 14.1 LAWS AND REGULATIONS
>
> This agreement shall be subject to the conservation laws of the state of Tennessee; to the valid rules, regulations, and orders of the Oil and Gas Board of Tennessee; and to all other applicable state and municipal laws, rules, regulations, and orders.

These passages clarify that the Underlying Leases remained in effect after approval of the Unit Agreement, the Unit Agreement did not transfer or alter the property rights established by the Underlying Leases, and the agreement did nothing to remove the Underlying Leases from the purview of § 66-7-103(a)(1).

### C. The Stop in Production and Subsequent Litigation

Defendants allege Plaintiffs did not commercially produce oil from their property between December 1994 and September 1995, a period exceeding six months. (Doc. 97.) On February 16, 2007, Defendants brought suit in the Circuit Court of Scott County against Plaintiffs and Plaintiffs' predecessors in interest seeking, in part, a declaration that the Underlying Leases were now void and terminated pursuant to Tennessee Code Annotated § 66-7-103(a)(1). (*Id.*) The Scott County Court bifurcated the issue of whether the Underlying Leases had terminated due to a stop in commercial production and submitted that question to a jury. *Id*. The jury found Plaintiffs did not commercially produce oil or gas from Defendant's land between December 1994 and September 1995. (Doc. 1-5.) The Scott County Court then issued an order dated January 13, 2009 confirming the jury's finding regarding the stop in commercial production and ordering that the Underlying Leases had terminated as of September 1995 (the "January 2009 Order"). (*Id.*)

The remaining issues in the case were resolved in a separate trial (Doc. 102), after which both Plaintiffs and Defendants raised issues on appeal (Doc. 1-6). The Tennessee Court of Appeals identified five discrete issues it would address, only one of which involved the jury's finding that commercial production on Defendants' land stopped between December 1994 and September 1995—whether the trial court erred in instructing the jury on the definition of commercial production under § 66-7-103. (*Id*. at 4.) The appellate court found that Plaintiffs had failed to include the relevant jury instruction in the record, and thus the court presumed the Scott County Court gave appropriate instructions.[1] (*Id*. at 9.) As a result, the jury's finding regarding the stop in production and the Scott County Court's related order were not disturbed.

---

[1] Additionally, Plaintiffs concede in their motion "[t]he Court of Appeals affirmed the

Since the resolution of the state court litigation, Plaintiffs have continued operations on Defendants' land, despite Defendants' objections and attempts to interfere with Plaintiffs' operations. (Doc. 97.) On April 15, 2013, Plaintiffs brought this action against Defendants asserting a civil RICO claim and several related state-law claims. (Doc. 1.) Each of these claims is based on the premise that Plaintiffs own the working interest in Defendants' land. On May 4, 2015, Defendants filed countersuit alleging several claims premised on Defendants' ownership of the working interest in their own land. (Doc. 64.)

## II. STANDARD OF REVIEW

Summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the burden of demonstrating no genuine issue of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Leary v. Daeschner*, 349 F.3d 888, 897 (6th Cir. 2003). The Court should view the evidence, including all reasonable inferences, in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Nat'l Satellite Sports, Inc. v. Eliadis Inc.*, 253 F.3d 900, 907 (6th Cir. 2001).

## III. DISCUSSION

Both Plaintiffs and Defendants raise threshold issues the Court must address before reaching the question of who owns the working interest in Defendants' property. Plaintiffs argue

---

rulings of the Scott County Circuit Court with one exception, reducing the amount of damages awarded to Jim Reed on the verbal lease issue." (Doc. 102.) Plaintiffs thus admit the January 2009 Order was not overturned on appeal.

that determining ownership of the working interest in Defendants' property is barred by res judicata and that Defendants' claims are time barred. Defendants argue that both a determination regarding the termination of the Underlying Leases and a determination that Plaintiffs own the working interest in Defendants' land are barred by res judicata.

### A.  Statute of Limitations

Plaintiffs argue Defendants' counterclaims are barred by various Tennessee statutes of limitations. This argument is simply inaccurate. Defendants' counterclaims are based on the premise that Plaintiffs continue to occupy and operate on Defendants' land with no legal right to do so. Plaintiffs argue these claims are based on the 1994 stop in commercial production, and use 1994 as a starting point for their statute of limitations calculations. The conduct to which Defendants object, however, is both recent and ongoing, and thus there is no statute of limitations issue. (*See* Doc. 64.)

### B.  Res Judicata

Both parties raise res judicata arguments regarding the previous state court litigation between the parties. Res judicata refers to the "preclusive effect of a judgment" and includes both claim preclusion and issue preclusion, also known as collateral estoppel. *Hanger Prosthetics & Orthotics East, Inc. v. Henson*, 299 Fed. App'x 547, 554 (6th Cir. 2008) (quoting *Taylor v. Sturgell*, 553 U.S. 880, 892 (2008)). "Claim preclusion generally refers to the effect of a prior judgment in foreclosing successive litigation of the very same claim, whether or not relitigation of the claim raises the same issues as the earlier suit. Issue preclusion generally refers to the effect of a prior judgment in foreclosing successive litigation of an issue of fact or law actually litigated and resolved in a valid court determination essential to the prior judgment, whether or not the issue arises on the same or a different claim." *New Hampshire v. Maine,* 532

U.S. 742, 748–49 (2001). When analyzing res judicata claims, this Court gives the same effect to Tennessee state court judgments as would be afforded by another Tennessee state court. 28 U.S.C. § 1738; *Marrese v. Am. Acad. of Orthopaedic Surgeons,* 470 U.S. 373, 380 (1985); *Henson*, 299 Fed. App'x at 554.

### 1. Claim Preclusion

Under Tennessee law, claim preclusion requires four elements: (1) the underlying judgment was rendered by a court of competent jurisdiction; (2) the same parties were involved in both suits; (3) the same cause of action was involved in both suits; and (4) the underlying judgment was final and on the merits. *Gerber v. Holcomb*, 219 S.W.3d 914, 917 (Tenn. Ct. App. 2006). Claim preclusion "is broader in its application than a mere determination of the questions involved in the prior action. The bar of the judgment in such cases extends not only to matters actually determined, but also to other matters which in the exercise of due diligence could have been presented for determination in the prior action." *Id*. at 918.

#### a. Plaintiffs' Claim Preclusion Argument

Plaintiffs argue that deciding which party owns the working interest in Defendants' property is barred by the doctrine of res judicata because this issue could have and should have been raised in the prior state court litigation. The parties agree the Scott County Court was a court of competent jurisdiction, and the same parties or their privies were involved in the prior suit. Additionally, this Court finds the Scott County Court's January 2009 Order was final and on the merits.[2] The disagreement between the parties lies in whether Defendants, in the exercise

---

[2] Plaintiffs characterize this order as a "non-final, interim order." (Doc. 102). Defendants dispute this characterization. (Doc. 108.) Nothing on the face of the order suggests it is "non-final" or "interim," (*see* Doc. 1-5), and no subsequent order withdraws, amends, or confirms the January 2009 Order. The Scott County Court's subsequent judgment in the case is consistent with the effect of the January 2009 Order. (Doc. 1-6.) On appeal, the Tennessee

8

of due diligence, should have presented the working interest issue for determination in the prior suit. *See Gerber*, 219 S.W.3d at 918.

Defendants were under no obligation to ask the Scott County Court to decide that Defendants owned the working interest in their land after deciding the Underlying Leases had terminated. Once the Scott County Court determined the Underlying Leases had terminated, the effect of § 66-7-103(a)(1) on Plaintiffs' interest in Defendants' property was unambiguous. Defendants could not foresee that Plaintiffs would fail to accept the natural operation of § 66-7-103(a)(1), and should not be burdened now because they failed to seek a court order confirming the natural and unambiguous collateral consequences of the Scott County Court's January 2009 Order. Defendants' motion is not barred by res judicata.

b.  **Defendants' Claim Preclusion Argument**

Defendants' first res judicata argument regards the termination of the Underlying Leases. They argue the Scott County Court's January 2009 Order satisfies the elements of res judicata as to this issue, and therefore this Court should not address the question of whether the Underlying Leases terminated after the 1994 stop in commercial production. Defendants are correct that revisiting the termination of the Underlying Leases is inappropriate. *See Gerber*, 219 S.W.3d at

---

Court of Appeals referred to the January 2009 Order, stating "[t]he Trial Court entered an order declaring that the oil and gas lease between the parties was terminated for failure to produce oil and gas effective September 19, 1995, based upon the jury's finding." (Doc. 1-7.) Although the Appellate Court referenced a "corrected order," the corrected order appears to deal with entirely different subject matter than the January 2009 Order. (*Id*.) Based on the face of the order and subsequent case material, the Court finds the January 2009 Order carries the full force of the Scott County Court's authority.

9

Case 3:13-cv-00203-CLC-HBG   Document 119   Filed 11/03/16   Page 9 of 13   PageID #: 1280

917. The Court need not analyze this argument in detail, however, because Plaintiffs do not ask the Court to revisit the termination of the Underlying Leases.[3]

### 2. Issue Preclusion

Defendants also argue res judicata prevents this Court from deciding that Plaintiffs own the working interest in Defendants' property. This is a question of issue preclusion, or collateral estoppel.[4] Under Tennessee Law, the elements required for issue preclusion are more stringent than those required for claim preclusion:

> To prevail with a collateral estoppel claim, the party asserting it must demonstrate (1) that the issue to be precluded is identical to an issue decided in an earlier proceeding, (2) that the issue to be precluded was actually raised, litigated, and decided on the merits in the earlier proceeding, (3) that the judgment in the earlier proceeding has become final, (4) that the party against whom collateral estoppel is asserted was a party or is in privity with a party to the earlier proceeding, and (5) that the party against whom collateral estoppel is asserted had a full and fair opportunity in the earlier proceeding to contest the issue now sought to be precluded.

*Mullins v. State*, 294 S.W.3d 529, 535 (Tenn. 2009). Despite the relatively straightforward effect of § 66-7-103(a)(1), ownership of the working interest in Defendants' property was not actually raised, litigated, and decided on the merits in the Scott County case. Plaintiffs dispute the effect of the termination of the Underlying Leases and § 66-7-103(a)(1) on their ownership of the working interest in Defendants' property, and they were not afforded the opportunity to raise

---

[3] Plaintiffs refer to the Scott County Court's January 2009 Order as a "non-final" order, and use the phrase "alleged stop in production" when referring to the December 1994 stop in commercial production, but nowhere in their motion, response, or reply do they argue the Underlying Leases are still operative. (*See* Docs. 102, 106, 107).

[4] In the Scott County Case, Defendants sought a declaration that the Underlying Leases had terminated. The termination of the Underlying Leases was thus subject to a claim preclusion argument. As Plaintiffs point out in their response, the issue of the working interest is more properly characterized as an argument for issue preclusion, and is thus analyzed under a more stringent standard. Curiously, Plaintiffs do not apply this standard to their own working interest res judicata argument. For the reasons explained in section III(B)(1)(a), above, their argument would fail under either the claim preclusion or issue preclusion standard.

their arguments in the Scott County case. Additionally, the ownership of the working interest and the termination of the Underlying Leases are not "identical" issues. For these reasons, determining the ownership of the working interest in Defendants' property is not barred by issue preclusion.

### C. Ownership of the Working Interest

Defendants own the working interest in the oil and gas beneath their property. Section 66-7-103(a)(1) requires reversion of Plaintiffs' working interest to Defendants after a stop in production lasting six months or longer: "If, at any time after the ten-year period, commercial production of oil or natural gas is terminated for a period of six (6) months, all such rights shall revert to the owner of the estate out of which the leasehold estate was carved." A jury determined that commercial production on Defendants' property stopped between December 1994 and September 1995, and a court of competent jurisdiction entered an order confirming this finding and terminating the Underlying Leases pursuant to § 66-7-103(a)(1). (Doc. 1-5.) Here, Defendants are the "owner[s] of the estate out of which the leasehold was carved." Plaintiffs' working interest in Defendants' property, established by the Underlying Leases, thus automatically reverted back to Defendants after the six-month break in production beginning in December 1994.

Contrary to Plaintiffs' argument, the existence of the Unit Agreement does not shield Plaintiffs from § 66-7-103(a)(1). No language in the Unit Agreement has the effect of defending Plaintiffs from the reversion clause, and, even if it did, such language would be void pursuant to § 66-7-103's clause prohibiting parties from waiving the reversion requirement.

Plaintiffs point to no specific language in the Unit Agreement which shields them from the effect of § 66-7-103(a)(1)—in fact, Plaintiffs cite to language in Article Three of the Unit

Agreement that has the opposite effect, including Articles 3.1, 3.3, and 3.4.[5] (Doc. 102 at 4 n.4.) When read alongside Article 3.5,[6] these sections clarify that the Underlying Leases remained in effect after the Unit Agreement was executed and remained the source of Plaintiffs' property interests in the land at issue. The Underlying Leases were thus the sole source of Plaintiffs' working interest in Defendants' property, and, when those leases terminated, Plaintiffs' working interest automatically reverted back to Defendants pursuant to § 66-7-103(a)(1).

Plaintiffs' argument also fails as a result of § 66-7-103(a)(1)'s clause prohibiting parties from waiving that section's reversion requirement. Even if the Unit Agreement had supplanted the Underlying Leases as the source of Plaintiffs' working interest, the Unit Agreement would be

---

[5] Article 3.3 is cited in full above. Articles 3.1 and 3.4 read as follows:

3.1 OIL AND GAS RIGHTS UNITIZED

Subject to the provisions of this agreement, all Oil and Gas Rights of Royalty Owners in and to the lands described in Exhibit A, and all Oil and Gas Rights of Working Interest Owners in and to said land, are hereby unitized in so far as the respective Oil and Gas Rights pertain to the Unitized Formations, so that operations may be conducted as if the Unitized Formation had been included in a single lease executed by all Royalty Owners, as lessors, in favor of all working Working Interest Owners, as lessees, and as if the lease had been subject to all of the provisions of this agreement.

3.4 CONTINUATION OF LEASES AND TERM ROYALTIES

Operations, including drilling operations, conducted with respect to the Unitized Formation on any part of the Unit Area, or production from any part of the Unitized Formation, except for the purpose of determining payments to Royalty Owners, shall be considered as operations upon or production from each Tract, and such operations or production shall continue in effect each lease or term royalty interest as to all lands covered thereby just as if such operations had been conducted and a well had been drilled on and was producing from each Tract.

[6] Article 3.5 is cited in full above. It states in part "[n]othing herein shall be construed to result in the transfer of title to the Oil and Gas Rights by any party hereto to any other party or to the Unit Operator." As the Unit Operators, Plaintiffs thus did not receive any new property rights, such as a working interest, from the execution of the Unit Agreement.

subject to § 66-7-103(a)(1). That section applies to "[a]ny lease or oil or natural gas rights or any other conveyance of any kind separating such rights from the freehold estate of land," and goes on to state "[n]o assignment or agreement to waive the provisions of this subsection (a) shall be valid or enforceable." As a result, even if the Unit Agreement were the source of Plaintiffs' working interest, their argument would fail because § 66-7-103(a)(1) would apply to the Unit Agreement as a conveyance separating oil and gas rights from the freehold estate of land. The six-month stop in commercial production would then still cause Plaintiffs' working interest to revert to Defendants under the statute. No language in the Unit Agreement shields the parties from § 66-7-103(a)(1) (in fact, the Unit Agreement is clear in Article 14.1 that § 66-7-103(a)(1) applies to the Unit Agreement), but even if it did, such language would be void under § 66-7-103(a)(1)'s clause prohibiting waiver of the statute's effect.

## IV. CONCLUSION

The Court finds Defendants own the working interest in the oil, gas, and minerals beneath Defendants' property because Plaintiffs' working interest reverted to Defendants via statute. The Court will therefore **GRANT** Defendants' motion for partial summary judgment (Doc. 97) and **DENY** Plaintiffs' motion for partial summary judgment (Doc. 101).

**An appropriate order will enter.**

/s/ _____
**CURTIS L. COLLIER**
**UNITED STATES DISTRICT JUDGE**